ROMAN SYSTEMS, LTD., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Roman Systems, Ltd. v. Commissioner
Docket No. 13936-78.
United States Tax Court
T.C. Memo 1981-273; 1981 Tax Ct. Memo LEXIS 470; 42 T.C.M. (CCH) 7; T.C.M. (RIA) 81273; June 1, 1981. *470 P, a corporation, was unable to lease property without its shareholders assuming personal responsibility for the leases. However, P's shareholders were unwilling to assume such personal responsibility without being compensated for their risk. Two of P's shareholders, through a partnership formed solely for such purpose, leased property and subleased such property to P for a rental in excess of that paid by the partnership. Held, under the circumstances, the full amount of P's rentals was paid as a condition to the continued use or possession of property; P's deductible expenses are not limited to the amount which the partnership was obligated to pay to its lessors. Sec. 162(a)(3), I.R.C. 1954. John A. Mraz and Anthony L. Giordano, for the petitioner. Frank D. Armstrong, Jr., for the respondent. SIMPSON
MEMORANDUM FINDINGS OF FACT AND OPINION SIMPSON, Judge: The Commissioner determined deficiencies in the petitioner's Federal income taxes as follows: Taxable Year Ended
Deficiency
Sept. 30, 1975
$ 13,637.00
Sept. 30, 1976
11,255.36
After the settlement of some of the issues, the sole issue for decision is whether rental payments made by the petitioner to a partnership established by two of its shareholders, to the extent such payments exceeded the rentals which such partnership was required to pay to its lessors, were required to be made as a condition to the continued use or possession of proeprty. FINDINGS OF FACT Some of the facts have been stipulated, and those facts are so found. The petitioner, Roman Systems, Ltd., is a North Carolina corporation. At the time it filed its petition in this case, its principal business address was in Hickory, N.C. The petitioner filed its Federal corporate income tax returns for its fiscal years ended September 30, 1975, and *472 September 30, 1976, with the Internal Revenue Service, Memphis, Tenn. We shall identify its taxable year by the calendar year in which it ended. The petitioner uses the accrual method of accounting. In March 1973, the petitioner was incorporated for the purpose of operating franchise restaurants. The primary purpose for incorporating was to insulate its shareholders from personal liability. At the time of incorporation, one of the shareholders, H.V. Chason, transferred to it a franchise for a Western Sizzlin Steakhouse (Western), which he had acquired in November 1972 for $ 8,000. Such franchise was for the Hickory, N.C., area and covered a 2-mile radius; it was for a 25-year period and was renewable. Mr. Chason is the vice president of the petitioner and is the father-in-law of Dean Hawkins, who is the president of the petitioner. The following table shows the petitioner's shareholders, their relationship to Mr. Hawkins, their investments in the petitioner as of March 1973 and September 1974, and their percentage of stock ownership as of September 1974: Investments in Petitioner Shareholder
Relationship
March 1973
Sept. 1974
D. Hawkins
$ 6,000
$ 18,000
H. Chason
father-in-law
8,000
2,000
M. Hawkins
brother
2,000
3,000
T. Durham
friend
2,000
3,000
L. Davis
friend
2,000
3,000
G. Yates
friend
1,200
$ 21,200
$ 29,000
*473 Percentage
Shareholder
Total
Sept. 1974
D. Hawkins
$ 24,000
49.0
H. Chason
10,000
20.4
M. Hawkins
5,000
10.2
T. Durham
5,000
10.2
L. Davis
5,000
10.2
G. Yates
$ 49,000
100.0
After the petitioner was incorporated, Mr. Hawkins and Mr. Chason and the other shareholders began looking for a site in Hickory on which to locate a Western. It soon became apparent that potential lessors were unwilling to enter into a lease with the petitioner without the personal guarantees of its shareholders. Their refusal to do so was principally due to three factors: the petitioner was a new and unproven corporation, there was a high mortality rate for franchise restaurants, and the building required by the petitioner would be a single-purpose type building. On two occasions, the petitioner applied to the North Carolina National Bank to secure financing for the construction of its own building in Hickory. Both loan applications were denied. In September 1973, Mr. Hawkins and Mr. Chason, on behalf of the petitioner, began negotiating with the Village Corporation (Villagee, owner of a shopping center in the Hickory area, to have Village construct a *474 restaurant building on its property and lease the building and land to the petitioner. However, Village was unwilling to construct a building and lease it to the petitioner on the strength of the petitioner's credit alone. Village required that the petitioner's shareholders, primarily Mr. Chason--the wealthiest of such shareholders, assume personal responsibility for any lease. Mr. Hawkins advised the petitioner's other shareholders of Village's proposals, and each of such shareholders was offered the opportunity to share in the arrangement. However, each of the shareholders, with the exception of Mr. Hawkins and Mr. Chason, was unwilling to assume personal responsibility for the lease with Village. Mr. Hawkins and Mr. Chason were willing to assume such personal responsibility provided they were compensated for the risk they would be undertaking. An agreement was reached among, and approved by, all of the shareholders whereby Mr. Hawkins and Mr. Chason would personally enter into the lease with Village, thereby assuming sole responsibility for the performance of such lease, but would be compensated for the risk involved by subleasing the restaurant premises to the petitioner *475 at a higher rental than they were required to pay Village. In January 1974, an agreement and lease were executed among Village, Mr. Hawkins, Mr. Chason, their spouses, and Two Romans (a partnership composed of Mr. Hawkins and Mr. Chason) (the partnership). The lease was for an initial term of 10 years, with three renewal options. The rental terms of the lease agreement were as follows: Tenant agrees to pay to Landlord during the initial term of this Lease and during the three (3) additional terms, provided the options for same are exercised, a minimum monthly rental of TWO THOUSAND TWO HUNDRED FIFTY ($ 2,250.00) DOLLARS payable in advance on or before the first (1st) day of each calendar month during the initial term hereof or any extended terms hereof. As additional rental Tenant shall pay to Landlord within forty-five (45) days at the end of each anniversary date of the initial term or any extended terms an amount equal to five (5%) per cent on the first SIX HUNDRED THOUSAND ($ 600,000.00) DOLLARS of gross food sales less sales taxes plus four (4%) per cent on the next FOUR HUNDRED THOUSAND ($ 400,000.00) DOLLARS of gross food sales less sales taxes plus three (3%) of all *476 gross food sales less taxes over ONE MILLION ($ 1,000,000.00) DOLLARS, with said additional rental to be diminished by the minimum monthly [sic] rental hereinabove set out. In July 1974, Mr. Hawkins and Mr. Chason executed a written partnership agreement. For purposes of sharing profits or losses, it was agreed that Mr. Chason and his wife would have a 75-percent interest in the partnership and Mr. Hawkins and his wife a 25-percent interest. Such ratios were based on the respective net worths of Mr. Chason and Mr. Hawkins and their respective abilities to sustain losses. In July 1974, pursuant to the prior shareholder agreement, the partnership subleased the restaurant premises to the petitioner on essentially the same terms as its lease from Village, except that the sublease provided for higher rental payments. The rental terms of such sublease were as follows: Tenant agrees to pay to Landlord during the initial term of this Lease and during the three (3) additional terms, provided the options for same are exercised, a minimum monthly rental of TWO THOUSAND SEVEN HUNDRED FIFTY ($ 2,750.00) DOLLARS payable in advance on or before the first (1st) day of each calendar month *477 during the initial term hereof or any extended terms hereof. As additional rental Tenant shall pay to Landlord within forty-five (45) days at the end of each anniversary date of the initial term of [sic] any extended terms an amount equal to six (6%) per cent of gross food sales less sales taxes with said additional rental to be diminished by the minimum monthly rental hereinabove set out. No rental payments were required to be made by either the partnership or the petitioner under the leases until the restaurant commenced operations. The spread between the rentals paid by the partnership to Village and those paid by the petitioer to the partnership was arrived at by good faith bargaining between Mr. Hawkins, on behalf of the petitioner, and Mr. Chason, on behalf of the partnership. Village began construction of the restaurant building in April 1974 and completed construction in December 1974. The restaurant opened its doors to the public soon thereafter and was an immediate financial success, exceeding the petitioner's most optimistic expectations. In July 1975, the petitioner, through Mr. Hawkins and Mr. Chason, acquired the Western franchise for Asheville, N.C. Subsequently, *478 Mr. Hawkins and Mr. Chason, on behalf of the petitioner, began negotiating with the owner of land suitable for the construction of a restaurant in Asheville. The owner of such land was aware of the arrangement the petitioner had with Village and was willing to lease such property only on a similar basis. An agreement was reached among the shareholders that Mr. Hawkins and Mr. Chason would personally enter into the lease of the Asheville property and would sublease such property to the petitioner at a higher rental in order to compensate them for their risk. In September 1975, Mr. Hawkins, Mr. Chason, their spouses, and the partnership executed a lease of the Asheville property. The lease was for a 10-year term with three renewal options. The rental terms were as follows. Tenant agrees to pay to Landlord during the initial term of this Lease and during the three (3) additional terms, provided the options for same are exercised, a minimum monthly rental of TWO THOUSAND SIX HUNDRED AND 00/100 ($ 2,600.00) DOLLARS payable in advance on or before the first (1st) day of each calendar month during the initial term hereof or any extended terms hereof or Tenant shall pay to Landlord *479 within sixty five (65) days at the end of each annual anniersary date of the initial term or any extended terms and [sic] amount equal to five (5%) per cent on the first ONE MILLION ($ 1,000,000) DOLLARS of gross food sales less sales taxes plus three (3%) per cent on all gross food sales over ONE MILLION ($ 1,000,000.00) DOLLARS less sales taxes with said additional rental to be diminished by the minimum monthly rental hereinabove set out. In February 1976, pursuant to the prior shareholder agreement, the partnership subleased the Asheville property to the petitioner on essentially the same terms as the prime lease, except that the sublease provided for higher rental payments. The rental terms of such sublease were as follows: Tenant agrees to pay to Landlord during the initial term of this Lease and during the three (3) additional terms, provided the options for same are exercised, a minimum monthly rental of THREE THOUSAND TWO HUNDRED AND 00/100 ($ 3,200.00) DOLLARS payable in advance on or before the first (1st) day of each calendar month during the initial term hereof or any extended terms hereof or Tenant shall pay to Landlord within sixty five (65) days at the end of *480 each annual anniversary date of the initial term or any extended terms and [sic] amount equal to seven (7%) per cent on the first ONE MILLION ($ 1,000,000) DOLLARS of gross food sales less sales taxes plus five (5%) per cent on all gross food sales over ONE MILLION ($ 1,000,000.00) DOLLARS less sales taxes with said additional rental to be diminished by the minimum monthly rental hereinabove set out. No rental payments were required to be made by either the partnership or the petitioner under the leases until such time as the Asheville restaurant commenced operations. Construction on the Asheville restaurant building was begun in October 1975, and the restaurant was opened in April 1976. As in the case of the arrangements concerning the Hickory premises, the spread between the rentals the petitioner paid to the partnership and those paid by the partnership to its lessor was the result of good faith bargaining between Mr. Hawkins and Mr. Chason. For its taxable years 1975 and 1976, the partnership paid rentals on the Hickory and Asheville restaurant premises as follows: Year
Location
Rent
1975
Hickory
$ 41,361.33
1976
Hickory
48,030.00
Asheville
18,857.10
*481 For such taxable years, the petitioner paid to the partnership rentals on such restaurant premises as follows: Year
Location
Rent
1975
Hickory
$ 53,043.00
1976
Hickory
64,060.00
Asheville
26,399.84
For its 1975 taxable year, the rentals paid by the petitioner represented 6.00 percent of its gross sales. For its 1976 taxable year, the rentals paid by the petitioner represented 6.26 percent of its gross sales. On its 1975 and 1976 Federal corporate income tax returns, the petitioner claimed a rental expense deduction for such payments. In his notice of deficiency, the Commissioner disallowed such rental expense deductions to the extent that such expenses exceeded the rentals which the partnership was required to pay to its lessors. OPINION Section 162(a), Internal Revenue Code of 1954, [1] provides that a taxpayer may deduct all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on a trade or business including: *482 (3) rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of proprty * * * The sole issue for decision is whether the portion of the rentals paid by the petitioner which was in excess of the rentals paid by the partnership comes within the meaning of such section. Section 162(a)(3) does not specifically limit deductions for rental payments to a "reasonable allowance." Imerman v. Commissioner, 7 T.C. 1030, 1037 (1946). Nevertheless, it is well settled that the statute does not permit deductions for rentals or other payments for the use of proprty which are excessive in amount, taking into consideration all the facts of the particular case. Limericks, Inc. v. Commissioner, 165 F. 2d 483, 484 (5th Cir. 1948), affg. 7 T.C. 1129 (1946); Davis v. Commissioner, 26 T.C. 49, 56 (1956); Place v. Commissioner, 17 T.C. 199, 203 (1951), affd. per curiam 199 F. 2d 373 (6th Cir. 1952), cert. denied 344 U.S. 927 (1953); Imerman v. Commissioner, supra.
*483 Where the parties to the transaction are strangers dealing at arm's length, their contract is usually given a presumption of reasonableness. Although there is no prohibition against a shareholder leasing property to his corporation, no such presumption attaches where the parties to a lease have an interest on both sides of the transaction. Midland Ford Tractor Co. v. Commissioner, 277 F. 2d 111, 114 (8th Cir. 1960), affg. a Memorandum Opinion of this Court, cert. denied 364 U.S. 881 (1960). In such a situation, we must carefully examine the facts to see whether the amounts claimed as deductible rental payments were in fact and in law required to be paid or whether such payments were in fact something else paid under the guise of rent. Potter Electric Signal and Manufacturing Co. v. Commissioner, 286 F. 2d 200 (8th Cir. 1961), affg. a Memorandum Opinion of this Court; Place v. Commissioner, supra; Stanwick's Inc. v. Commissioner, 15 T.C. 556 (1950), affd. per curiam 190 F. 2d 84 (4th Cir. 1951). The petitioner has the burden of proving *484 that the rentals did not exceed what would have been paid if the leases had been negotiated at arm's length with a stranger. Rule 142(a), Tax Court Rules of Practice and Procedure; Utter-McKinley Mortuaries v. Commissioner, 225 F. 2d 870, 874 (9th Cir 1955), affg. a Memorandum Opinion of this Court; Place v. Commissioner, supra.
The record in this case is clear that the lease agreements between the partnership and its lessors were arm's-length transactions between strangers, and the Commissioner does not challenge the reasonableness of such rent. The record is equally clear that the subleases between the partnership and the petitioner were transactions between closely related parties, in that Mr. Hawkins and Mr. Chason, between them, held 69.4 percent of the petitioner's stock. The Commissioner argues that because of such close relationship, the negotiations between the partnership and the petitioner could not have been at arm's length, and that therefore, the petitioner's deductible rental payments cannot exceed those which the partnership was required to pay to its lessors. The thrust of the Commissioner's argument at trial and on brief *485 is that rather than structuring the leases as it did, the petitioner should have leased the restaurant premises directly from the prime lessors with Mr. Hawkins and Mr. Chason personally guaranteeing such leases. Had the transactions been so structured, the petitioner's rental expenses would not have exceeded those which the partnership was obligated to pay its lessors. Hence, he argues, the excess rentals paid by the petitioner were not rent but merely a means of compensating Mr. Hawkins and Mr. Chason for the risk they incurred by assuming personal responsibility for the prime leases. Thus, the Commissioner would have us view the subleases as an attempt by Mr. Hawkins and Mr. Chason, with the knowledge and consent of the petitioner's other shareholders, to siphon off some of the petitioner's potential profits in the guise of rent. At the time the prime leases and subleases were entered into, the petitioner was an unproven corporation embarking on a type of business venture which had a high failure rate. Without its shareholders, particularly Mr. Chason, in some manner assuming personal responsibility for the leases, the petitioner would have been unable to acquire buildings in *486 which to operate its restaurants; but Mr. Chason and Mr. Hawkins were not willing to assume such personal responsibility without being compensated for their risk. It is true that the arrangements were entered into in order to so compensate them; yet, such objective is not dispositive of the issue. The critical question is whether the rentals paid by the petitioner exceeded those that would have been required in leases negotiated at arm's length. See Place v. Commissioner, 17 T.C. at 203. [2] The record convinces us that the rentals paid by the petitioner to the partnership did not exceed such amount. The Commissioner argues that the rentals paid by the partnership to its lessors reflect the fair rental value of the leased premises, since those were the only amounts fixed by arm's-length bargaining. However, the Commissioner ignores the fact that the lessors were unwilling to lease the buildings directly to the petitioner based on its credit alone. A fair rental value, as the interest on a loan, takes into consideration both market forces and the risks involved. If *487 the petitioner could have leased the restaurant premises without its shareholders assuming personal responsibility for such leases, a lessor undoubtedly would have demanded higher rentals in order to compensate him for the increased risk. Hence, although the terms of the leases which the partnership executed with its lessors are some indication of the fair rental value of the leased premises, they are not determinative of the rentals that would have been charged the petitioner had it been able to obtain such leases based on its credit alone. This is not a case where there was a sole shareholder dealing with a corporation; here there were other shareholders who approved of the transactions. Although such shareholders held only a minority position in the petitioner, 30.6 percent, their interests were adverse to those of Mr. Hawkins and Mr. Chason; yet, they knew of the arrangements, they were given an opportunity to share in them, and they all approved of the profits earned by Mr. Hawkins and Mr. Chason as a result of the arrangements. More importantly, the interests of Mr. Hawkins were, in large measure, adverse to those of Mr. Chason. Mr. Chason was the older and wealthier of *488 the two and, in the event of the petitionr's business failure, had the most to lose. As a result, Mr. Chason had a 75-percent interest in any income to be derived by the partnership, and he stood to bear 75 percent of any loss sustained by it. In the negotiations, he represented the partnership, and he had an interest in maximizing its profits. On the other hand, Mr. Hawkins held a 49-percent interest in the petitioner; as a result, he represented the petitioner in the negotiations, and it behooved him to work out the arrangements most advantageous for the petitioner. Hence, although not strangers to the transaction, the relative disparity of their interests in the partnership and the petitioner were such that they can be said to have bargained at arm's length. As staed in Jos. N. Neel Co. v. Commissioner, 22 T.C. 1083, 1090 (1954), where the Court was required to determine if a rental arrangement was sufficiently reasonable to achieve the same result as arm's-length dealing: While the actions of a family corporation or family group should be carefully scrutinized, it *489 is entirely conceivable that the relations each with the other, or their respective personalities, may be such that they will deal with each other strictly at arm's length. In fact, it sometimes happens that their very nearness in blood leads them to be more independent in action than strangers in blood. * * * In addition, the rentals paid by the petitioer to the partnership appear to be in line with the amount that the petitioner would have been required to pay to an unrelated lessor. The petitioner did not present expert testimony as to the fair rental value of the leased premises had it been able to lease such premises on the strength of its credit alone. However, Mr. Hawkins testified that in the mid-1970s, the typical rent paid by a Family Sizzler Steakhouse franchise was $ 2,800 per month or 8.5 percent of gross sales, whichever was greater. He also testified that the typical rent paid by a Western franchise was either $ 3,500 per month, with a 5-percent annual escalation clause over the term of the lease, or in the alternative, a flat rate of rent or 6 to 7 percent of gross sales, whichever was greater. Also, the petitioner introduced statistical summaries compiled for *490 the National Restaurant Association, which, based on a national average, showed that for 1977 a typical restaurant paid rents equal to 6.7 to 8.1 percent of its gross sales. Such evidence is not as persuasive as expert testimony concerning the fair rental value of the leased premises, but it does serve to show that the rentals paid by the petitioner to the partnership (6.00 percent of gross sales for 1975 and 6.26 percent for 1976) were in line with the rentals the petitioner would have been required to pay to an unrelated lessor. Thus, given the circumstances of this case, we believe that the rentals called for in the petitioner's leases with the partnership were fair and reasonable and do not exceed those that would have resulted from arm's-length bargaining between strangers. [3]
The Commissioner relies on Utter-McKinley Mortuaries v. Commissioner, supra, where in a dual lease transaction similar to the ones before *491 us, the petitioner's claimed rental deduction was disallowed. However, the facts of that case are clearly distinguishable. In Utter-McKinley, the prime lessor was unwilling to lease to a corporation for personal reasons and was willing to lease only to such corporation's majority, and essentially sole, shareholder. Such shareholder then leased the real property to his corporation at a flat monthly rent five times that which he was obligated to pay his lessor. Although the prime lease did provide for a percentage of sales over a specified amount, the amount paid by the corporation was greatly in excess of the amounts actually paid by the shareholder to his lessor. Moreover, Utter-McKinley was an established and successful corporation, and it did not argue that the excess rentals were compensation for risk, since there was obviously little or no risk involved. On such facts, it was found that the sublease was merely an attempt to siphon off profits from the corporation. As such, the excess rentals were not "wrung from it by compulsion of circumstances delineated by law." 225 F. 2d at 874. In the present case, the subleases had legitimate business purposes, and *492 the rentals paid by the petitioner to the partnership were reasonable in amount and were not an attempt to distribute the petitioner's profits in the form of rent. In conclusion, we hold that on the facts and circumstances of this case, the full amount of the rentals paid by the petitioner in 1975 and 1976 were paid "as a condition to the continued use or possession of property" within the meaning of section 162(a)(3). To reflect concessions by the petitioner, Decision will be entered under Rule 155. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954 as in effect during the years in issue.↩
2. See also Griffith Motors, Inc. v. Commissioner, T.C. Memo. 1977-84↩.
3. See Velvet Horn, Inc. v. Commissioner, T.C. Memo. 1981-227; William E. Davis & Sons, Inc. v. Commissioner, T.C. Memo. 1981-178; Griffith Motors, Inc. v. Commissioner, T.C. Memo. 1977-84↩.